IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| WADE A. EICHHORN and | * | Chapter 13 |
| JENNIFER L. EICHHORN, | * | |
|     Debtors | * | |
| | * | Case No.: 1-05-bk-03045 |
| IVAN J. ZOOK & SONS, INC, | * | |
| ROBERT ZOOK and JAMES ZOOK, | * | |
|     Objectants | * | |
| | * | |
| v. | * | |
| | * | |
| WADE A. EICHHORN and | * | |
| JENNIFER L. EICHHORN, | * | |
|     Respondents | * | |
| | * | |

## OPINION

### Procedural and Factual History

Before the Court is the objection of Ivan J. Zook & Sons, Inc. ("IJZ"), Robert Zook and James Zook (the "Zooks") (collectively "Objectants") to the chapter 13 plan of Wade A. and Jennifer L. Eichhorn ( "Debtors").[1] Debtors' bankruptcy petition and plan were filed on May 7, 2005. On October 13, 2005, Objectants filed an objection to the plan, asserting that it had not been proposed in good faith as required by 11 U.S.C. §1325(a)(3). For the reasons set forth below, the objection will be sustained.

IJZ sold and serviced lawn, garden and farm equipment. Prior to 1993, IJZ was managed by the Zooks, its shareholders. Wade Eichhorn ("Eichhorn") first began working for IJZ when he graduated from high school in 1988. After five years with the company, Eichhorn was named President and General Manager pursuant to an agreement through which Debtors agreed to

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(J).

purchase the business, including the premises, for $820,000.00. Under the terms of the agreement, shares in the company were to be transferred to Debtors over a period of several years. After the agreement was executed, Robert Zook continued to be involved in the day-to-day operations of the business as a salesman. In the summer of 2004, Eichhorn hired his wife to serve as IJZ's office manager. Jennifer Eichhorn ("Ms. Eichhorn") has a bachelor's degree in business administration, and before being hired to work at IJZ, was employed in the business offices of an automobile dealership, a bank, and a steel company.

Both before and after the sale of the business, IJZ sold New Holland farm equipment, in addition to other lines of farm and garden equipment.[2] Prior to the sale to Debtors, approximately eighty percent of IJZ's annual revenues were generated by sales of New Holland equipment. Most of the New Holland inventory was subject to floor plan financing through New Holland's financing subsidiary. During his tenure as President and General Manager of IJZ, Eichhorn caused or allowed numerous pieces of New Holland equipment, with a value estimated by Objectants to be $437,000.00, to be sold out of trust.[3] As office manager, Ms. Eichhorn was aware of these sales. Through an audit conducted in February 2005, New Holland discovered that IJZ had failed to remit the sale proceeds of equipment subject to New Holland's lien. As a

---

[2]The testimony revealed that the New Holland brand name has undergone various alterations due to takeovers and mergers. For purposes of the instant decision, "New Holland" sufficiently identifies the affected creditor.

[3]Approximately 45 units were sold out of trust, including equipment subject to New Holland's security interest. Debtors admit to having sold New Holland equipment out of trust, however they dispute Objectants' proof regarding the aggregate value of the equipment. Because the value of the collateral is not determinative of the resolution of the plan objection, the Court finds it unnecessary to analyze the voluminous number of documents submitted to establish value.

result of this discovery, IJZ was stripped of its license to sell New Holland equipment, and Eichhorn's employment at IJZ was terminated.[4] After Eichhorn's termination the Zooks resumed managment of the business.

During the period Eichhorn controlled IJZ's operations, Debtors used the assets of the corporation for their personal benefit. IJZ credit cards were used to purchase personal items and Debtors caused IJZ to become a co-obligor on purchases or leases of two motor vehicles acquired primarily for Debtors' personal use. Debtors used IJZ inventory to barter for personal goods and services. For example, in January 2005 Eichhorn transferred a "soft sided cab enclosure" valued at $1,495.00 to a customer of IJZ who installed a kitchen countertop valued at $495.00 at Debtors' personal residence in lieu of making payment to the corporation.

In the schedules included with their petition, Debtors reported that Ms. Eichhorn held a "remainder interest" subject to a life estate in a property located in Yeagertown, Pennsylvania ("the Yeagertown property"). After the ownership interest in the Yeagertown property was questioned, Debtors admitted that Ms. Eichhorn owns the property in fee simple. A document purporting to grant life estates in the Yeagertown property to Ms. Eichhorn's parents was submitted in connection with an appraisal of the "remainder" interest listed in the schedules, but the document was never acknowledged and, therefore, never recorded. The value of the

---

[4]Termination of Eichhorn's employment did not invalidate Debtors' contract to purchase IJZ's business premises. Debtors' schedule "A" lists the business premises as being property of the estate, and schedule "D" lists the Zooks as holding a claim in the amount of $220,000.00 secured by the IJZ premises. At the time the petition was filed the property also was subject to a first mortgage held by Kishacoquillas Valley National Bank ("Kish Bank") in the amount of $185,000.00. On August 22, 2005, Debtors and Kish Bank filed a stipulation that granted Kish Bank relief from the automatic stay and provided that Debtors would execute a deed in lieu of foreclosure in favor of the bank in exchange for the forgiveness of certain loan guarantees.

3

Yeagertown property is approximately $65,000.00, but Debtors' schedule "A" valued Ms. Eichhorn's "life estate" interest at $19,000.00.

At the time of the hearing, Ms. Eichhorn was employed by Standard Steel Company as an accounts payable supervisor at an annual salary of approximately $48,000.00. Eichhorn was employed as a truck driver earning $9.50 per hour with P.A.K. Transport, Belleville, Pennsylvania. Debtors' schedules "I" and "J" show combined monthly net income of $5,147.00 with monthly expenses of $4,957.00. Debtors have two dependents, both of whom were under the age of five at the time of the hearing.

## Discussion

Objectants assert that Debtors' plan has not been proposed in good faith as required by 11 U.S.C. §1325(a)(3). Good faith is at issue both at the commencement of a case and at the confirmation of a plan. It comes into play at the filing of a petition through § 1307(c) of the Code, which provides that the court may dismiss a case or convert it "for cause." Addressing the definition of "cause" under § 1307(c), the Court of Appeals for the Third Circuit held that the absence of good faith in the filing of a chapter 13 petition establishes cause for dismissal of a case. *In re Lilley*, 91 F.3d 491 (3d Cir. 1996). In *Lilley*, the Court of Appeals determined that

> the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances. Factors relevant to the totality of the circumstances inquiry may include, among others, the following: the nature of the debt . . . ; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

4

*In re Lilley*, 91 F.3d at 496 (citing *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992)).[5]

Good faith also is at issue at plan confirmation. In order to be confirmed, a chapter 13 plan must be proposed in good faith. 11 U.S.C. § 1325(a)(3). The analyses under § 1307(c) and under § 1325(a)(3) are similar, but not identical. "[T]he good faith inquiry under Section 1307(c) is a broad inquiry focusing on the fairness involved in the initiation of Chapter 13 bankruptcy proceedings, while the good faith inquiry under Section 1325(c) is a more narrow inquiry focusing on the good faith with regard to the Chapter 13 plan." *In re Love*, 957 F.2d at 1360. *See also In re Goddard*, 212 B.R. 233, 238, n. 4 (D. N.J. 1997); *In re Butt*, 1999 WL 1038241, *5 (Bankr. S.D. Ohio 1999). Therefore, although a totality of the circumstances approach using the *Lilley* factors is required to determine whether a *petition has been filed* in good faith, application of a totality of the circumstances approach when considering whether a *plan has been proposed* in good faith requires the consideration of a somewhat different set of factors.

Before the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"), the Courts of Appeals articulated various multi-factored tests to evaluate whether a plan met the requirements of § 1325(a)(3).[6] Many of the factors cited by the courts were

---

[5]The Third Circuit cited with approval the totality of the circumstances approach adopted by the Seventh Circuit in *In re Love*, but the Court rejected one factor cited by the Seventh Circuit – whether the debt would be non-dischargeable in chapter 7 case. *In re Lilley*, 91 F.3d at 496 n. 2.

[6]One of the most frequently cited cases prior to BAFJA was *In re Estus,* 695 F.2d 311 (8th Cir.1982), which considered the following factors when evaluating a debtor's good faith in connection with the proposal of a plan: "(1) the amount of the proposed payment and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increase in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7)

incorporated in the amendments to § 1325. *In re LeMaire*, 898 F.2d 1346, 1349 (8th Cir. 1990). Since the 1984 amendments, the good faith analysis "has a more narrow focus. The bankruptcy court must look at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Educational Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987) *cited in In re Norwood,* 178 B.R. 683, 688 (Bankr. E.D. Pa. 1995), *In re Goddard*, 212 B.R. at 240. Lack of good faith in proposing a chapter 13 plan focuses on whether the plan demonstrates an abuse of the "provisions, purpose, or spirit" of chapter 13. *Matter of Smith*, 848 F.2d 813, 818 (7th Cir. 1988) (quoting *In re Rimgale*, 669 F.2d 426, 431(7th Cir. 1982)).

When analyzing a debtor's good faith, the court must be wary of "moralizing" about a debtor's conduct prepetition. *In re Norwood*, 178 B.R. at 688. Nonetheless, an examination of a debtor's conduct before and after a petition is filed is part of the totality of circumstances test when considering whether a plan has been filed in good faith. *In re Solomon,* 67 F.3d 1128, 1134 (4th Cir. 1995); *In re Tucker,* 989 F.2d 328, 330 (9th Cir. 1993); See also *In re Lilley*, 91 F.3d at 496 (debtor's treatment of creditors both before and after filing of petition is good faith factor under § 1307(c)).

---

the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought [bankruptcy] relief . . .; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; (11) the burden which the plan's administration would place upon the trustee; and (12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code." *Id.* at 316.

6

Bankruptcy Rule 3020(b)(2) provides that "if no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues." As a logical corollary, if objections are timely filed, the court need only consider evidence relevant to the grounds asserted in the objections. *Castello,* 127 B.R. at 258. The burden of proof as to the requirements for confirmation under 11 U.S.C. §1325(a) rests on the debtor and requires him to present evidence that he has met the statutory requirements. *In re Hines,* 723 F.2d 333 (3rd. Cir. 1983) (citing *Estus*, 695 F.2d at 316).

The good faith factors cited in *Zellner, Norwood* and *Goddard* apply to the instant case as follows:

    *a.    Have Debtors stated their debts and expenses accurately?*

Objectants have asserted that some of the expenses listed in Debtors' schedules are excessive, but generally they have not challenged the "accuracy" of the schedules reporting debts or expenses. In particular, they assert that Debtors' monthly mortgage payment is excessive in light of their current financial circumstances and the availability of the Yeagertown property, which is free and clear of liens and encumbrances. Objectants have focused primarily on the failure of Debtors to accurately report the ownership interest in the Yeagertown property and to report on schedule "G" the acquisition of a leased vehicle. They argue that Debtors should be compelled to sell their current residence and move into the Yeagertown property, thus relieving them of a mortgage payment of approximately $810.00 per month. In the alternative, Objectants argue that the liquidation of Ms. Eichhorn's property would generate a significant pool of funds to be paid into the plan. The Court agrees with Objectants' alternative argument. In *In re*

7

*Hatem*, 273 B.R. 900, 906 (S.D. Ala. 2001), the Court sustained an objection to a plan when it found that a debtor owned property which, if sold, would likely have generated $205,000.00 for her as one-half owner of the property. The debtor's share of the proceeds of the sale would have been more than sufficient to pay all of her unsecured debts in full. In the instant case, if Debtors' appraisal is accurate, a sale of the property would generate approximately $50,000.00 for the estate.

      *b.     Did Debtors make fraudulent misrepresentations to mislead the bankruptcy court?*

The term "fraudulent misrepresentation" has been defined most frequently by bankruptcy courts analyzing a creditor's claim for denial of the discharge of a debt under § 523(a)(2). *See, e.g., Rubin v. West (In re Rubin),* 875 F.2d 755, 759 (9th Cir. 1989) (Section 523(a)(2)(A) incorporates the traditional definition of fraudulent misrepresentation.); *In re Hurst* 337 B.R. 125, 131 (Bankr. N.D. Tex. 2005) ("Concealment of or silence regarding a material fact can constitute a fraudulent misrepresentation.") However, the term's usage in a § 523(a)(2) context – which requires proof of reliance and damages as a consequence of such reliance – is not directly applicable in the § 1325 context where the fraudulent misrepresentation is made to the Court, in addition to creditors. I interpret "fraudulent misrepresentation" in the context of § 1325 to be more closely analogous to fraud in the context of § 1330 (revocation of an order of confirmation), wherein a representation is considered to have been fraudulent if it "was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth." *In re Nikoloutsos*, 199 F.3d 233, 238 (5th Cir. 2000). Although materiality is at issue, reliance is not. Debtors had an obligation to make a full and accurate disclosure of their assets, and they verified the accuracy of their schedules under

8

penalty of perjury. This Court concurs with Judge Mannes opinion "that any person petitioning the Bankruptcy Court for relief has a duty to make full disclosure of his assets as an element of good faith required by 11 U.S.C. Section 1325(a)(3). Failure to do this evidences a lack of good faith on the part of the debtor." *In re Lewis*, 26 B.R. 379, 380 (Bankr. D. Md. 1982).

In the instant case, I conclude that Debtors made a fraudulent misrepresentation regarding the extent of Ms. Eichhorn's ownership interest in the Yeagertown property. IJZ introduced into evidence a certified copy of the deed dated January 25, 2001 in which Ms. Eichhorn's parents conveyed the Yeagertown property to her for $1.00. No life estate or other interest is reserved in the deed, which was duly recorded in the Mifflin County Courthouse on February 11, 2001. In response to IJZ's evidence, Debtors introduced an uncertified copy of an "Agreement" dated January 28, 2001 in which Ms. Eichhorn purports to agree that her parents shall have quiet enjoyment of the Yeagertown property for the rest of their natural lives. This agreement was not acknowledged, and it was not recorded.[7] Further, the appraisal supporting the valuation of the "remainder interest," selected excerpts of which were attached to schedule "A," was obtained less than two months before the petition was filed. If the interest had been accurately disclosed, the chapter 13 trustee would have had an opportunity to exercise the powers of a bona fide purchaser of real property under 11 U.S.C. § 544(a)(3) and set aside the conveyance. Debtors' representation regarding the life estate was, at the very least, made with reckless disregard for the truth.

---

[7] In order to be effective against third parties, in Pennsylvania a life estate must be recorded. 21 P.S. § 357.

9

This fraudulent misrepresentation not only demonstrates a lack of good faith, it also skews the plan's "Liquidation Analysis," which states that Debtors have non-exempt equity and assets in the amount of $8,800.00. In a chapter 13 case, if the value of assets claimed as exempt exceeds the allowed amount of the claimed exemptions, the court cannot confirm a plan unless it proposes to pay creditors the amount they would receive in a chapter 7 case. 11 U.S.C. §1325(a)(4).[8] Based upon the appraisal obtained by Debtors and submitted into evidence, the Yeagertown property is worth approximately $65,000.00 and most, if not all, of the value cannot be exempted. Thus, the plan's Liquidation Analysis is grossly inaccurate.

   *c.*  *Did Debtors unfairly manipulate the Bankruptcy Code?*

The Yeagertown property is an asset through which Debtors could pay a substantial portion of their unsecured debt. Instead, they are attempting to discharge hundreds of thousands of dollars in liabilities and potential liabilities while retaining for themselves a highly valuable asset. Of course, if Debtors' plan proposed to sell this property and use the proceeds for payments to creditors, it would have helped persuade creditors that Debtors were filing their plan in good faith. Debtors' plan, however, does not propose to sell the property. Instead, Debtors' attempt to portray the property as unmarketable due to the life estate held by non-debtors.

---

[8]Objectants do not specifically object to the plan on the grounds that the actual, non-exempt value of the Yeagertown property to the estate greatly exceeds the amount to be paid through the plan ($8,800.00) and thus, that the plan does not pass the best interests of creditors test under §1325(a)(4). Rather, Objectants focus on Debtors' mischaracterization of the nature of Ms. Eichhorn's interest in the Yeagertown premises (and consequent undervaluation of her interest) as evidence of bad faith. In their brief, Debtors admit that Ms. Eichhorn does hold a fee simple interest in the property, and they state that they "fully intend to amend their plan to include the full non-exempt value of said property." (Debtors' Brief at p. 4). Given Debtors' intent to amend the plan, the validity of the objection to the instant plan is essentially admitted. The willingness of debtors to "fess up" once they have been caught, however, does not erase bad faith present when the plan was proposed.

Accordingly, I conclude that Debtors unfairly manipulated the exemption provisions of the Bankruptcy Code by using such provisions to manufacture a basis on which to shield an asset otherwise available to their creditors.

> d. *Have Debtors attempted to abuse the spirit of Chapter 13?*

"[T]he basic purpose and spirit of Chapter 13 is rehabilitation and repayment of debt by periodic payments made to a trustee under bankruptcy court protection, with the aim of providing honest, unfortunate and genuinely financially distressed debtors an opportunity to obtain a fresh start." *In re McGovern,* 297 B.R. 650, 658 (S.D. Fla. 2003). Thus, an abuse of chapter 13 may be indicated where debtors have failed to put forth any effort to pay creditors and used bankruptcy to hinder collection by a single creditor. *In re Mattson,* 241 B.R. 629, 634 (Bankr. D. Minn. 1999). Abuse also may be indicated where a chapter 13 petition has been filed "in close proximity to entry of judgment or collection efforts against debtor suggestive of intent to avoid rather than repay debt." *In re McGovern,* 297 B.R. at 659, n. 6. Additionally, abuse may be indicated where there is evidence of "debtor reluctance to commit predicable future increases in income" to a plan even though "the debtor enjoys a particularly bright employment future." *Id.* "The . . . pertinent inquiry . . . is whether the debtor came to bankruptcy court seeking a fresh start under chapter 13 protection with an intent that is consistent with the spirit and purpose of that law – rehabilitation through debt repayment – or with an intent contrary to its purpose – debt avoidance through manipulation of the Code." *McGovern,* 297 B.R. at 660.

In the instant case, there is evidence that Debtors are attempting to abuse the spirit of chapter 13. Debtors introduced no evidence of prepetition efforts to repay their debts to the Zooks, IJZ or any other creditor. The bankruptcy petition was filed only a few months after

11

Eichhorn's position at IJZ was terminated, which indicates an intent to preempt Objectants' collection efforts, rather than an intent to attempt to repay the debt. Both Debtors enjoy stable sources of income and an unimpaired ability to increase their future incomes.

  e. *Other factors in the totality of circumstances – prepetition conduct.*

As the Factual History indicates, Debtors' prepetition conduct was highly prejudicial to the interests of IJZ and the Zooks, who hold the largest claims against the estate. Debtors' sales out of trust were, as that term implies, in breach of Eichhorn's fiduciary duties as president of the company. Debtors knowingly pillaged IJZ for their personal benefit without regard to the interests of the corporate entity. IJZ suffered the loss the licensing agreement to sell the equipment of its primary vendor as a result of Debtors' conduct. The Zooks lost a substantial source of income with the collapse of the business and incurred costs associated with resuming control of IJZ's business affairs.

Having considered all of these factors, I conclude that Debtors' plan was not filed in good faith. Accordingly, an order will be entered sustaining the objection to the plan.

            BY THE COURT,

            *Mary D. France*
            Bankruptcy Judge

Date: September 18, 2006

  *This document is electronically signed and filed on the same date.*

12

Case 1:05-bk-03045-MDF Doc 73 Filed 09/18/06 Entered 09/18/06 13:06:26 Desc
Main Document Page 12 of 12